[Crim. No. 17894. First Dist., Div. One. Mar. 28, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
JEFFERY RAY ROSS, Defendant and Appellant.

## COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Clifton R. Jeffers, Chief Assistant State Public Defender, Harriet Wiss Hirsch, Michael J. Kallis, Deputy State Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, W. Eric Collins and David D. Salmon, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

RACANELLI, P. J.—Defendant Jeffery Ray Ross and codefendant Lanny Atkins were charged by information with crimes of murder, robbery, burglary and arson; the murder count included a penalty enhancement allegation that it had been committed by means of torture with intent to kill. An arming clause as to defendant Ross was stricken and the cases were severed for trial. A jury returned a verdict of guilty as to all counts, fixing the degree at first degree on the three crimes first mentioned and finding the murder penalty enhancement allegation true. On appeal from the judgment, defendant claims a number of errors related to sufficiency of the evidence, instructions, use of the codefendant's extrajudicial statements, prosecutorial misconduct, and penalty.

Our review of those claims in light of the whole record requires reversal of the arson conviction and affirmance of the remainder of the judgment as modified.

*Facts*

The essential facts may be summarized as follows:

During the afternoon of February 1, 1977, the Berkeley Fire Department responded to a fire at the scene of the crime where they discovered the body of the 90-year-old victim, Remi L. Dufau, lying next to a smoldering bedroom mattress; the victim's hands and feet were trussed together behind his back with a piece of electric cord and a knotted cloth was found next to the victim's neck. Their investigation revealed that the fire, which began in the area of the victim's head and shoulders, was of incendiary origin. Police investigation disclosed that the apartment had been thoroughly ransacked; the widow (who arrived later) provided a list of items missing from the apartment, including the victim's wallet, his Mastercharge card, several bottles of liquor and some jewelry. Upon defendant's arrest two days later, a search of his room uncovered the victim's wallet and identification. The next day the director of Harper House[1] delivered to the police a bottle of Christian Brothers brandy taken from the defendant's room as well as a bottle of Courvoisier cognac found in the codefendant's room; the brands matched those taken from the Dufau household.

At trial, forensic evidence established that the victim sustained (1) multiple rib fractures and associated hemorrhaging, and hemorrhage of the brain consistent with the infliction of blows, (2) a contused larynx caused by an attempted ligature strangulation and (3) extensive burns in the skull region. In the opinion of the pathologist the victim was still alive during the burning and that the cause of death was cardiorespiratory failure due to thermal burns and blunt trauma. In a recorded statement following his arrest, defendant confessed to his complicity in the planned burglary and robbery and in assisting Atkins in tying the victim and carrying him into the bedroom. Defendant denied any culpability for the arson and murder contending that codefendant Atkins alone administered the beating with a pipe and undertook preparations with the announced intention to set afire the blindfolded and gagged victim; that despite his protestation, codefendant Atkins continued his grisly preparations prompting the defendant to leave (with some of the loot) before

---

[1]A residential youth facility where the defendants and witness Deloney then lived.

Atkins lit the match in order to avoid involvement in the anticipated murder. When Atkins later rejoined him outside, he informed the defendant that he had "burned him up" and that the event should prove newsworthy. Upon their return to their place of residence, they divided the stolen property.

Defendant did not testify, relying on the testimony of the only witness called by the defense, Anthony Deloney, a roommate to whom Atkins confessed his guilt of the charged crimes without mention of another's involvement or participation. Proof of Atkins' earlier convictions for the same crimes and torture allegation was offered into evidence by the defense pursuant to stipulation.

On rebuttal, the prosecution introduced impeachment testimony—over objection—consisting of two in-custody statements by Atkins to the authorities wherein he admitted guilt in the burglary and robbery incidents but denied any complicity in the arson and homicide or any such admission to Deloney. The net effect of Atkins' statements was to reciprocally shift the blame for the arson and torture-murder onto his confederate.[2]

We consider defendant's claims in an order and context promoting convenience of discussion.

I.

*Sufficiency of the Evidence*

■ Defendant severally contends that the record is barren of any substantial evidence linking him to the crimes of arson and murder by means of torture. ■ Upon review of such contentions the applicable test on appeal is whether substantial evidence exists to support the verdict, viewing the evidence and its inferences in a light favorable to the respondent. (See *People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].)

---

[2]While conceding his complicity in the burglary and robbery, Atkins describes the defendant as the active wrongdoer who actually planned the crimes, physically assaulted the victim accompanied by threats to kill if he refused to divulge the location of his money. In both statements, Atkins denied any involvement in the brutal attack and commission of arson upon the victim, alternatively claiming the victim was alive when he left while the defendant remained or when the defendant returned to the apartment "to take care of some business."

Defendant first contends, relying chiefly on what defendant terms the *Toledo* doctrine (*People* v. *Toledo* (1948) 85 Cal.App.2d 577 [193 P.2d 953]), that since his exculpatory statements were introduced during the People's case in chief, " '[t]he prosecution . . . is bound by the evidence in the absence of proof to the contrary.' " (See *People* v. *Toledo, supra,* at p. 581.) The argument is flawed in many particulars.

First, the so-called *Toledo* doctrine (whose genesis seems to have been merely an argument offered on appeal)[3] actually refers to a principle of judicial review invoked in homicide prosecutions obviating a defendant's burden of showing mitigation or justification where the prosecution's proof itself tends to show same or a lesser unlawful homicide. (Pen. Code, § 1105; see, e.g., *People* v. *Chapman* (1968) 261 Cal.App.2d 149, 177 [67 Cal.Rptr. 601]; *People* v. *Mercer* (1962) 210 Cal.App.2d 153, 159 [26 Cal.Rptr. 502]; *People* v. *Salaz* (1924) 66 Cal.App. 173, 181 [225 P. 777]; *People* v. *Estrada* (1923) 60 Cal.App. 477, 482-483 [213 P. 67].) The rule in its amended form is properly restricted to those cases where "all the prosecution evidence points to *excuse or mitigation.* If there is substantial evidence incompatible with the theory of *excuse or mitigation,* the jury may consider all the evidence and determine whether the act amounted to unlawful homicide. [Citations.]" (*People* v. *Chapman, supra,* 261 Cal.App.2d 149, 177; italics ours.) To the extent that the doctrine is founded upon a notion that the prosecution is bound by their witnesses' statements (see *People* v. *Davis* (1965) 63 Cal.2d 648, 655 [47 Cal.Rptr. 801, 408 P.2d 129]) on the antiquated theory of vouchsafing one's own witnesses (see Witkin, Cal. Evidence (2d ed. 1966) § 1270, pp. 1176-1177), that theory has long since been discarded in favor of the modern rule allowing impeachment of a witness by any party, "including the party calling him." (Evid. Code, § 785; *People* v. *Chacon* (1968) 69 Cal.2d 765, 779 [73 Cal.Rptr. 10, 447 P.2d 106, 34 A.L.R.3d 454].) In the final analysis the question of defendant's guilt must be resolved from *all* the evidence considered by the jury. (See *People* v. *Davis, supra,* 63 Cal.2d at p. 655; *People* v. *Chapman, supra,* 261 Cal.App.2d at p. 177.)

Herein, in addition to his confessed participation in the crimes of burglary and robbery, defendant admitted his active participation in hog-tying the victim and carrying him into the bedroom where he watched Atkins—whose propensity for committing arson crimes was known—heap clothing and debris upon the victim's upper body and douse them with a combustible toilet lotion. Under such circumstances

---

[3]Nor has the defendant correctly quoted the *Toledo* language relied upon.

the jury was entitled to find that the defendant knew of Atkins' maniacal purpose and that his conduct actively aided and promoted its commission; conversely, it was likewise entitled to reject defendant's claim that he had left the premises after his futile remonstrance but before the actual arson and killing. ■ Under established principles defining the derivative liability of an aider and abettor, the issue of whether upon such evidence the defendant knowingly aided and abetted Atkins in the depraved act, with resultant liability for its natural consequences, presented questions of fact for the jury. (*People* v. *Durham* (1969) 70 Cal.2d 171, 181 [74 Cal.Rptr. 262, 449 P.2d 198] [cert. den., 395 U.S. 968 (23 L.Ed.2d 755, 89 S.Ct. 2116) and 406 U.S. 971 (32 L.Ed.2d 671, 92 S.Ct. 2416)]; *People* v. *Villa* (1957) 156 Cal.App.2d 128, 134 [318 P.2d 828]; see also *People* v. *Standifer* (1974) 38 Cal.App.3d 733, 743-744 [113 Cal.Rptr. 653].) Such determination based upon substantial evidence, as here, may not be disturbed on appeal. (See *People* v. *Redmond, supra,* 71 Cal.2d 745, 755.)

■ Defendant next contends that since death resulted solely from an act in which he did not participate (arson), the evidence cannot support his conviction for the crime of murder by torture. The record refutes his contention. Expert testimony disclosed that the terminal cardiorespiratory failure was caused by *both* the inflicted trauma and thermal burning.[4] Where concurring causes contribute to the fatal result, one may be criminally liable by reason of his own conduct which directly contributes to such result. (See *People* v. *Lewis* (1899) 124 Cal. 551, 559 [57 P. 470]; 1 Witkin, Cal. Crimes, §§ 80, 82, pp. 80-82.) Defendant's participation in the brutal beating inflicted by Atkins during the course of the burglary and robbery clearly established his equal culpability for the resulting death due to combined causes. ■ Evidence of repeated beating of the victim with the intention of inflicting grievous pain and suffering for purposes of extortion (of money) constitutes murder by torture. (*People* v. *Turville* (1959) 51 Cal.2d 620, 632 [335 P.2d 678] [disapproved on other grounds, *People* v. *Morse* (1964) 60 Cal.2d 631, 649 (36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810)]; *People* v. *Daugherty* (1953) 40 Cal.2d 876, 886 [256 P.2d 911]; accord *People* v. *Wiley* (1976) 18 Cal.3d 162, 168, 173 [133 Cal.Rptr. 135, 554 P.2d 881].)

■ Moreover, the evidence supported the first degree murder conviction not only on a theory of murder by torture but also under the felony-murder doctrine (see Pen. Code, § 189), a theory likewise

---

[4]Defendant mistakenly relies on the expert witness' answer to a hypothetical question whether death would have resulted from the burns alone *if* no trauma had been inflicted.

advanced by the prosecution and upon which the jury was instructed. Any unlawful killing, intentional or otherwise, committed in the perpetration of robbery or burglary for the intended purpose of theft constitutes the crime of first degree murder. (See *People* v. *Burton* (1971) 6 Cal.3d 375, 387-388 [99 Cal.Rptr. 1, 491 P.2d 793]; *People* v. *Ireland* (1969) 70 Cal.2d 522, 538 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]; *People* v. *Turville, supra,* 51 Cal.2d 620, 631-632.) The record persuasively demonstrates that the victim was killed during the course of the robbery as a part of a continuing criminal transaction; the jury's implied finding that the killing occurred during and before completion of the crime of robbery is amply supported by the evidence justifying a guilty verdict under the felony-murder rule. (See *People* v. *Manson* (1976) 61 Cal.App.3d 102, 207-209 [132 Cal.Rptr. 265] [cert. den., 430 U.S. 986 (52 L.Ed.2d 382, 97 S.Ct. 1686)]; see also 1 Witkin, Cal. Crimes (1978 supp.) § 312, pp. 292-298 *passim.*)

■ Defendant's parallel contention that his conviction of murder by torture with intent to kill is unsupported by the evidence and contrary to law is valid.

■ ■ Although a specific intent to kill is not required in order to prove first degree murder by torture (*People* v. *Steger* (1976) 16 Cal.3d 539, 546 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206]; *People* v. *Mattison* (1971) 4 Cal.3d 177, 183 [93 Cal.Rptr. 185, 481 P.2d 193]), such state of mind must be proved in order to invoke the greater penalty of life imprisonment without possibility of parole then mandated by the statute.[5] Herein, the jury was properly instructed on the principles of first degree murder by torture[6] as approved by our highest court (see *People* v. *Wiley, supra,* 18 Cal.3d 162, 168, 173, and fn. 4; *People* v. *Steger, supra,* 16 Cal.3d at p. 546) and also on the necessity to find a specific intent to kill in conjunction with the "torture clause" allegation[7] bearing upon the issue of greater punishment.

[5]Penal Code section 190, repealed in 1977, formerly provided in pertinent part that "[e]very person otherwise guilty of murder in the first degree [excluding allegations and proof of special circumstances invoking the death penalty] shall suffer confinement in the state prison for life, unless he or she is guilty of murder in the first degree which is perpetrated by means of torture with the intent to kill, in which case he or she shall suffer confinement in the state prison without the possibility of parole." (See Pen. Code, §§ 190-190.5 added by Prop. No. 7, § 2, an initiative measure approved at Gen. Elec. (Nov. 7, 1978).)

[6]Instructions defining murder by torture, in language substantially similar to CALJIC No. 8.24, were submitted. .

[7]The relevant instructions are reported as follows:

"In the torture clause, the necessary specific intent is to cause cruel pain and suffering for the purpose of revenge, extortion, persuasion or for any sadistic purpose and to kill. . . .

"It is charged in Count one that the murder alleged therein was perpetrated by means

Defendant strenuously argues that the enhanced punishment of life imprisonment without parole requires a finding that the defendant *personally* committed the torturous conduct with the necessary homicidal intent. While we are aware of no authority squarely on point, the logic of defendant's argument by analogy is compelling. Typically, penal provisions imposing added punishment do not purport to define a criminal offense but simply relate to the penalty to be imposed under certain circumstances. (See *People* v. *Walker* (1976) 18 Cal.3d 232, 242-243 [133 Cal.Rptr. 520, 555 P.2d 306]; *People* v. *Strickland* (1974) 11 Cal.3d 946, 961 [114 Cal.Rptr. 632, 523 P.2d 672] [enhancement due to personal use of a firearm during commission of any enumerated felony].) Any reasonable doubt as to the meaning of a penal statute must be construed favorably to the defendant as appears reasonable. (*Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].) Under the 1976 amendment to former section 190 (Stats. 1976, ch. 1124, § 1; see also Stats. 1976, ch. 1139, § 133) the Legislature, in denying eligibility for parole to those convicted of first degree murder by means of torture with intent to kill, in effect enhanced the penalty of life imprisonment otherwise provided.[8] In light of our analysis, a defendant could not be subjected to such additional punishment on a theory of derivative liability but must have *actually committed* the proscribed conduct (*People* v. *Walker, supra,* 18 Cal.3d 232, 241-242) with the necessary animus. Such conclusion is fortified by the Legislature's subsequent action in deleting that special penalty provision as part of its comprehensive revision of the death penalty statutes and incorporating it as an alternative penalty upon charging and proving such murder by torture allegations as a special circumstance. (See Pen. Code, §§ 190, 190.1, 190.2, subd. (c)(4) added by Stats. 1977, ch. 316, §§ 5, 7 and 9, effective Aug. 11, 1977, repealed by initiative measure approved Nov. 7, 1978; see new Pen. Code, § 190.2, subd. (a)(18).)

of torture with intent to kill.

"If you find the defendant guilty of murder in the first degree as charged in Count one, it will then become your duty to determine whether or not said first degree murder was perpetrated by means of torture with intent to kill.

"In order to find that the torture clause applies in this case you must be convinced beyond a reasonable doubt of each of the following:

"One, the act or acts which caused the death must involve a high degree of probability of death and

"Two, this defendant committed such act or acts with the intent to cause cruel pain and suffering for the purpose of revenge, extortion, persuasion or for any sadistic purpose;

"Three, *this defendant committed such act or acts with the intent to kill* the deceased, and

"Four, the act or acts alleged to constitute torture must have caused the death." (Italics added.)

[8]Under the relevant statutory scheme any prisoner under a life sentence would normally become eligible for parole upon completion of a specified minimum term of imprisonment. (See generally Pen. Code, § 3000 et seq., particularly § 3046.)

Our search of the record discloses no substantial evidence of defendant's actual commission of the torture-murder *or* in support of the requisite state of mind. Accordingly, the jury's added finding that the first degree murder conviction was perpetrated by means of torture with intent to kill cannot stand and must be stricken.

II.

*Instructional Error*

Defendant next complains that the failure of the trial court to submit proffered instructions on proximate cause, supervening cause and conspiracy constituted reversible error. The complaint is without merit.

 It is, of course, settled that a trial court must instruct the jury, even without request, on the general principles of law relating to the issues raised by the evidence. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 714 [112 Cal.Rptr. 1, 518 P.2d 913].) In the case at bench, the court was under a duty to instruct on the issue of proximate causation. (See *People* v. *Bernhardt* (1963) 222 Cal.App.2d 567, 590-591 [35 Cal.Rptr. 401].) In submitting a standard instruction on proximate cause (CALJIC No. 8.55), the trial court adequately fulfilled that duty and was under no obligation to give further instructions covering the same issue. (*People* v. *Welch* (1972) 8 Cal.3d 106, 119-120 [104 Cal.Rptr. 217, 501 P.2d 225].) Moreover, there was no credible evidence of an independent supervening or superseding cause warranting the requested instruction. (See generally 1 Witkin, Cal. Crimes, §§ 83-84, p. 82.) As noted, the instruction given provided adequate guidance for the jury in resolving the issue whether defendant's conduct contributed as a proximate cause of death. Error—if any—resulting from the failure to submit the requested instruction was clearly harmless in light of the uncontradicted evidence that death occurred during the course of the admitted burglary and robbery.

 Nor was any duty manifested to submit instructions on conspiracy as requested by defendant. Not only did the prosecution disclaim any theory of uncharged conspiracy, but the defense did not rely on evidence suggesting such a theory. (Cf. *People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281].) Defendant's unusual argument in requesting such instructions (to show termination of and withdrawal from the completed agreement to commit burglary and robbery before the murder) is fully

answered by the additional instruction given on the prosecution's theory of aiding and abetting (CALJIC No. 3.02 (1974 rev.)). Thus, the jury was adequately informed that no criminal liability attached where an accomplice notifies the other party "of his intention to withdraw from the commission of the crime and . . . [does] . . . everything in his power to prevent its commission." Apart from the defendant's verbal rebuke of Atkins' contemplated act of arson before leaving the apartment in order to avoid witnessing the murder, no competent evidence was presented tending to suggest a theory of withdrawal or abandonment warranting "cautionary" instructions on conspiracy. In such circumstances, no error is committed in failing to instruct on the law of conspiracy (see *People* v. *Washington* (1969) 71 Cal.2d 1170, 1174 [81 Cal.Rptr. 5, 459 P.2d 259, 39 A.L.R.3d 541]) nor does the dictum found in *People* v. *Joines* (1970) 11 Cal.App.3d 259, 268-269 [89 Cal.Rptr. 661], otherwise persuade us.

### III.

*Admission of codefendant's statements for impeachment; prosecutorial misconduct*

Defendant next argues prejudicial error was committed through introduction—over objection—of Atkins' in-custody statements for purpose of impeachment and in the misuse of such evidence during the prosecutor's summation to the jury.

Defendant's initial challenge upon constitutional grounds rests upon the assertion that the use of his accomplice's out-of-court statements inculpating him in the arson and torture-murder deprived him of his right to confrontation and cross-examination resulting in a denial of due process of law. (U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 15; see *Chambers* v. *Mississippi* (1973) 410 U.S. 284 [35 L.Ed.2d 297, 93 S.Ct. 1038]; *Pointer* v. *Texas* (1965) 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065].) Defendant's argument is four-fold: (1) the admission of such damaging statements to attack the credibility of Atkins' statement received in evidence, pursuant to Evidence Code section 1202, violated his Sixth Amendment rights; (2) the trial court's limiting instructions failed to cure the devastating effect of such evidence; (3) there was no sufficient foundation of "unavailability" and "due diligence" as required by the relevant statutes (see Evid. Code, §§ 240, subd. (a)(1), 1202); (4) the evidence should have been excluded under the provisions of Evidence Code section 352. Only the final ground has merit and, coupled with counsel's misconduct, resulted in prejudicial error.

██ Evidence of a declarant's statement inconsistent with his statement received in evidence is admissible for the purpose of impeachment. (Evid. Code, § 1202; *Am-Cal Investment Co.* v. *Sharlyn Estates, Inc.* (1967) 255 Cal.App.2d 526, 542 [63 Cal.Rptr. 518].) The purpose of the evidentiary rule is one of fairness to the party *against whom* the hearsay evidence was admitted without opportunity to cross-examine or impeach the unavailable hearsay declarant. (*Id.* at p. 542; see also *People* v. *Beyea* (1974) 38 Cal.App.3d 176, 193 [113 Cal.Rptr. 254].) ██ Atkins' confession to Deloney, which tended to exonerate the defendant of arson and murder by torture, was introduced by the defense as a declaration against penal interest (Evid. Code, § 1230); the showing of unavailability as a witness was based upon Fifth Amendment considerations due to Atkins' earlier conviction and pending appeal. (See Evid. Code, § 240, subd. (a)(1).) Under such circumstances, the only means available to the People to attack Atkins' credibility was through the process of impeachment afforded by the statute. (Cf. *People* v. *Marquez* (1979) 88 Cal.App.3d 993, 998 [152 Cal.Rptr. 200].) Since such evidence was not received for the truth of the matter asserted, no Sixth Amendment guarantees were abridged.[9] (Cf. *Dutton* v. *Evans* (1970) 400 U.S. 74, 88 [27 L.Ed.2d 213, 226-227, 91 S.Ct. 210]; *People* v. *Preston* (1973) 9 Cal.3d 308, 315-316 [107 Cal.Rptr. 300, 508 P.2d 300]; *People* v. *Coleman* (1969) 71 Cal.2d 1159, 1164 [80 Cal.Rptr. 920, 459 P.2d 248]; *United States* v. *Eaglin* (9th Cir. 1977) 571 F.2d 1069, 1078-1081 [cert den., 435 U.S. 906 (55 L.Ed.2d 497, 98 S.Ct. 1453)].)

██ Nor does section 1202 require a preliminary showing of unavailablity; it merely permits impeaching evidence without the necessity that the *declarant* be given an opportunity to explain or deny the inconsistency. ██ Moreover, it seems specious for defendant to first argue unavailability on grounds of constitutional privilege and thereafter to deny its existence when similarly relied upon by the prosecution.[10]

---

[9]We are mindful that a related but different question is presently pending review by the California Supreme Court. (See *In re Johnny G.,* Crim. No. 20519, hg. granted May 18, 1978.*)

[10]Defendant's subsidiary contention that the prosecution could have achieved the necessary state of unavailability by granting statutory immunity to Atkins (see Pen. Code, § 1324) is unpersuasive. The prosecution is under no obligation to grant immunity to a particular witness. (*People* v. *Sipress* (1975) 51 Cal.App.3d 98, 102, fn. 1 [123 Cal.Rptr. 884]; *People* v. *Williams* (1970) 11 Cal.App.3d 1156, 1163-1164 [90 Cal.Rptr. 409]; *People* v. *Williams* (1968) 265 Cal.App.2d 888, 897 [71 Cal.Rptr. 773].)

---

*Reporter's Note: For Supreme Court opinion see 25 Cal.3d 543 [159 Cal.Rptr. 180, 601 P.2d 196].

█ Yet, while such evidence was admissible for the limited purpose intended, its probative value herein was substantially outweighed by its "substantial danger of undue prejudice . . . [and of] . . . misleading the jury." (Evid. Code, § 352.) While we fully recognize the trial court's broad discretion under that statute, it is not unlimited. (See *People* v. *Montgomery* (1976) 61 Cal.App.3d 718, 730-731 [132 Cal.Rptr. 558].) Not only did such evidence intrinsically possess a high probability to mislead and confuse the jury to the defendant's prejudice but the prosecutor consistently compounded that probability for error through his repeated and misleading closing remarks to the jury as to the *substantive effect* of such limited evidence.[11] In urging the jury to consider *Atkins' statements in contrast to defendant's denials* in his own confession, the former were forcefully argued as evidence of the truth of the matter stated contrary to their limited probative use. Failure to exclude such evidence because of its demonstrably strong likelihood of misleading the jury constituted an abuse of discretion. Furthermore, the prosecutor's repeated misstatements of the *effect* of such evidence constituted misconduct. (See *People* v. *Strickland, supra,* 11 Cal.3d 946, 955.) █ The combined effect of such error undoubtedly contributed to the jury's verdict on the arson count upon which the evidence of defendant's participation was close; under such circumstances, we are not convinced that such error was harmless under either state or federal standards. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Strickland, supra,* 11 Cal.3d at p. 955; *People* v. *Coleman, supra,* 71 Cal.2d 1159, 1165.) █ But as to the remaining counts, the error was harmless. The evidence of defendant's guilt in the perpetrated burglary and robbery, during which the killing occurred, was overwhelming; no reasonable possibility or probability exists that a different or more favorable verdict on the murder, burglary or robbery charges would have resulted had such error not occurred. (*Chapman* v. *California, supra,* at p. 24 [17 L.Ed.2d at pp. 710-711]; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

---

[11]The following passages are illustrative:

"MR. PAYNE [the prosecutor]: Let's look at the similarities *between what this defendant told the police and what Lanny Atkins told the police* and they are striking. Each said that the whole idea of robbing this man and burglarizing this particular apartment was the other guy's idea.

"MR. CIRAOLO [defense counsel]: Your Honor, Objection, compound, misstating the evidence. . . .

"MR. PAYNE: Let's look at the similarities between what this defendant told the police and what Lanny Atkins told the police and *examine each of their credibilities. Each said* that the whole idea of robbing this man, burglarizing this particular apartment was the other's idea. *Each said* that it was the other who knocked on the door. *Each said* that it was the other who engaged the victim in conversation about gardening. *Each says* that it was the other who first rushed the old man, assaulted him and knocked him to the floor.

In view of our decisions above, it is unnecessary to discuss the remaining issues presented on appeal.

Judgment of conviction of arson is reversed. Judgment of conviction of first degree murder by means of torture with intent to kill is modified by striking the enhancing allegation; as so modified, the judgments of conviction of first degree murder, burglary and robbery, and each of them, are affirmed.

Elkington, J., and Newsom, J., concurred.

---

*Each said* that he, himself, held the victim down while the other went off into the other room, got electrical cord, returned and hogtied the victim.

"*Each says* that they both carried the hogtied victim into the bedroom. *Each said* that the other placed the victim's head between the legs of the chair. *Each said* that he doesn't know why the chair was put in such relation to the victim's head by the other person who did it. *Each denies* that any one strangled the victim. *Each denies* that anyone ripped open any pillows in search for the alleged treasure. *Each says* that there were actually three bags full of loot.

"Finally, *each says* that he, himself, took all three bags out, leaving the other behind with the still living victim. . . .

"In short, each attempts to deny that any torturous conduct on either of their parts occurred.

"Lanny Atkins' attempt was foiled by a jury of twelve citizens. It is up to you people to determine whether Jeffery Ross' attempt will succeed or fail. . . .

"We talked about the similarities *between what this defendant told the police and what the other defendant told the police.* . . .

"I am going to go over that very briefly once again. . . . [Which he did in a similar vein despite the following admonition.]. . .

"THE COURT: I think what Mr. Ciraolo was pointing to was simply that the substance of Mr. Atkins' statement to the District Attorney's office and the substance of Mr. Atkins' statement to Sgt. Wolke of the police department was not admitted in this case for the truth of the matter contained therein.

"MR. PAYNE: *Of course,* Your Honor.

"THE COURT: It is simply to give the jury the basis for making the determination as to whether or not anything Mr. Atkins said at any time is believable or on which occasion they accept a particular version of what he said.

"MR. PAYNE: That is exactly right and I am talking about the credibility of Mr. *Lanny Atkins and Mr. Jeffery Ross.*" (Italics ours.)