Filed 5/17/23 P. v. Kheav CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>AARON KHEAV,<br><br>     Defendant and Appellant. | A165542<br><br>(Alameda<br>Super. Ct. No. 171030D) |

The Provocative Act Murder Doctrine is still a viable theory for murder despite changes in the law under Senate Bill No. 1437 (SB 1437) and Senate Bill No. 775 (SB 775), and any accomplice shares responsibility for the murder even without committing their own provocative act, if they have the requisite mental state of malice aforethought.

Aaron Kheav appeals from an order denying his petition for resentencing under Penal Code section 1170.95 after he entered a guilty plea to second degree murder.[1] The court found that the prosecution proved beyond a reasonable doubt that Kheav committed murder under the provocative act doctrine. Kheav contends this was error, claiming (1) provocative act murder is no longer a viable theory for murder and (2)

---

[1] All statutory references are to the Penal Code. Effective June 30, 2022, section 1170.95 was renumbered as section 1172.6. (Stats. 2022, ch. 58, § 10.) For consistency with the record, we continue to refer to the operative statute as section 1170.95.

1

substantial evidence does not support the conclusion that he committed provocative act murder.

We will affirm the order. There was sufficient evidence supporting the trial court's conclusion that the prosecution proved, beyond a reasonable doubt, that Kheav was guilty of second degree murder under the provocative act theory.

## I. FACTS AND PROCEDURAL HISTORY

In February 2014, an amended information charged Kheav (and his co-defendants Saun Oeurn, Phon Mey, Scott Moeun, and Danny Vo) with one count of murder (§ 187, subd. (a)); three counts of attempted murder (§§ 664, 187, subd. (a)); and one count of shooting at an inhabited dwelling (§ 246). As to each count, the amended information alleged multiple firearm and great-bodily-injury enhancements (§§ 12022.5, subd. (a), 12022.53, subds. (b)–(d), (g), 12022.7, subd (a)).

In May 2015, Kheav entered a plea of no contest to voluntary manslaughter (§ 192, subd. (a)) with an enhancement for personal use of a firearm (§ 12022, subd. (a)(1)) and attempted murder (§§ 664, 187). The plea agreement included a negotiated term of 14 years, four months, and was contingent on Kheav providing truthful testimony in the trial of his codefendants.

### A. Co-Defendants' Trial

Oeurn, Mey, Moeun, and Vo were tried before a jury. In violation of his plea agreement, Kheav refused to testify.

2

1. <u>Trial Evidence</u>[2]

Kheav, Oeurn, Mey, Moeun, and Vo, as well as Jordan Chhit and Alex Thum, were members or associates of the Asian Streetwalkers gang (ASW) in Oakland. On January 28, 2012, they learned that members of ASW had been attacked by members and associates of a rival gang, the Oak Town Crips (OTC), at a shooting near the site of a party attended by OTC members.

The ASW group gathered at the home of Thum's girlfriend. Mey was armed with a 7.62 x 39 millimeter semiautomatic rifle with an extended banana clip; Kheav, Oeurn, Moeun, Vo, and Chhit were each armed with semiautomatic pistols. Oeurn drove the group (except Thum) to a location near the party and remained inside the van while the others walked down the street to a pickup truck parked across from the party.

One of the party attendees, Von Neak, saw the ASW group staring at the house and Mey holding a rifle. Neak assumed a defensive position and removed his .40 caliber semiautomatic pistol from its holster, keeping it pointed down, and began to load it. An ASW member standing next to Mey stepped forward and fired at Neak; the group fired more shots at Neak, striking him in the chest. Neak returned fire and was later taken to the hospital and survived.

During the gunfight, Mey, Moeun, Vo, Kheav and Chhit all fired their weapons. Mey fired 35 to 38 rounds from his rifle, and the others fired more than 50 additional rounds. In addition, a group from the house party

---

[2] The summary of trial evidence is taken from this court's 2017 opinion in the appeal by Oeurn and Mey. (*People v. Oeurn* (Nov. 29, 2017, A147159) [nonpub. opn.]; see Cal. Rules of Court, rule 8.1115, subd. (b)(2).) The 2017 opinion was submitted to the trial court for the section 1170.95 evidentiary hearing, and the parties stipulated that the court could rely on its factual summary. Both parties rely on it in their appellate briefs.

3

returned fire with semiautomatic weapons and a shotgun, fatally wounding Chhit of the ASW group. Another associate of OTC was grazed in the shootout as well. A firearms expert determined that the expended casings and shells came from a minimum of 11 different weapons.

### 2. Verdict and Sentence

The jury was instructed on, among other things, provocative act murder.

In August 2015, the jury found Oeurn and Mey guilty of first degree provocative act murder, attempted murder, and shooting at an inhabited dwelling. They were acquitted of the two other attempted murder charges. The jury found Mey had intentionally discharged a firearm causing great bodily injury and death. In December 2015, Oeurn was sentenced to 25 years to life and Mey was sentenced to 60 years and 8 months to life. They appealed. In November 2017, this court found instructional error on the murder charges and gave respondent the option of retrying those charges or having the convictions reduced to second degree murder.

The jury did not reach verdicts as to Moeun and Vo, and the court declared a mistrial as to them. In April 2016, Moeun pleaded guilty to voluntary manslaughter and attempted murder with enhancements and was later sentenced to 26 years, eight months. In September 2017, Vo pleaded guilty to voluntary manslaughter with a negotiated term of six years.

### B. Kheav's Plea and Sentence

As to Kheav, the trial court granted the prosecution's motion to rescind his plea for refusing to testify at his codefendants' trial. In August 2016, Kheav entered a plea of no contest to second degree murder. In October 2016, the court sentenced him to a term of 15 years to life.

4

C. Kheav's Resentencing Petition

In 2018, SB 1437 was enacted to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); see *People v. Gentile* (2020) 10 Cal.5th 830, 842.) It accomplished this by, among other things, amending section 189 such that murder liability is not imposed on persons convicted of felony murder unless they were the actual killer, an aider and abettor who acted with intent to kill, or a major participant in the underlying felony who acted with reckless indifference to human life.

SB 1437 also created section 1170.95, which established a procedure for defendants convicted of murder under the old law to seek resentencing in the trial court if they believe they could not be convicted of that crime given the above amendment to section 189. (Stats. 2018, ch. 1015, § 4.)

In January 2019, Kheav filed a petition for resentencing pursuant to section 1170.95.[3] The court appointed counsel and ordered briefing. The prosecution argued that Kheav's murder conviction was based on the provocative act doctrine and, therefore, he was not eligible for relief. Kheav's attorney maintained that he "could not be convicted of murder on a currently valid theory of liability." Defense counsel asserted, "As [Kheav] rode in the

---

[3] Effective January 1, 2022, SB 775 amended section 1170.95 to expand its scope and clarify its procedures. (Stats. 2021, ch. 551.) Among other changes, the amendment clarified the standard of proof for the section 1170.95, subdivision (d), evidentiary hearing. The parties do not contend that the amendment gives rise to an issue in this appeal.

van as a passenger, his only intent was to help his friends shoot up a house as a statement in retaliation for the earlier shooting at Mr. MEY."

### 1. Evidence of Kheav's Statement to the Prosecutor

Among the evidence submitted to the court was a transcript and recording of Kheav's interview with Deputy District Attorney Robert Graff before agreeing to his initial plea deal.

Kheav's statements to the prosecutor were largely consistent with the foregoing statement of facts. Kheav acknowledged that he affiliated with the ASW. He and the rest of the group learned that a member of rival gang OTC chased and shot at Mey near a house party on 20th Avenue in Oakland. The group gathered at a house on 23rd Avenue and decided to see if the OTC members who shot at Mey were still there. Kheav explained, "In a gang when you get shot at by somebody you're gonna wanna go look for 'em." The group went to the site of the house party in a single van, so they could be more "sneaky" and the people at the house party would not see their individual cars. All of them (except Oeurn) had firearms, and although Kheav claimed that "everybody in Oakland" carries a gun and he did not know what was going to happen, Kheav knew they were not going to the house party merely to "hang out" or chat with the rival gang members. The group parked around the corner from the house party, and everyone but Oeurn got out and walked to a point across the street from the house.

Kheav then described events not established at the trial. He claimed that when the group initially arrived across the street from the house, he told the group: " 'Ain't nobody here,' I'm like, 'They ain't here, let's just go.' " Someone else agreed there were no OTC members there, and they started walking back to the van. A video admitted into evidence at the hearing

6

showed that the group did, in fact, turn around and started heading back toward the van.

That video, however, showed that the group turned around again and walked *back* to a spot across the street from the house party; Kheav claimed they did so because Vo saw a car that he associated with the OTC gang.

In addition, although at trial there was no evidence that the two groups communicated before the gunfight, Kheav claimed that someone from the house said, " 'Whatever happened earlier, we didn't have nothin' to do with it, it's like the person that did that, they're not here,' " and something to the effect of "we don't want no problem."  Kheav then suggested to the group that they leave because the "dude that did it ain't here" and "they don't want no problem."

While the trial evidence showed that an ASW member standing next to Mey fired the first shot at Von, Kheav identified that shooter as Moeun.  According to Kheav: "I'm gettin' ready to turn around and leave and, like, Scott, just pulled his gun out—he's, uh, he said, 'Fuck this shit, cuz.'  And then, he just shot across the street."  Kheav recalled that Moeun fired a lot of rounds.

Although the trial evidence showed that other ASW members fired shots before OTC member Von Neak returned fire, Kheav claimed that the group at the house returned Moeun's fire as soon as they heard a shot, before any other ASW members—including Kheav—fired their weapons.  He asserted that Moeun fired two or three rounds before shots came back, and after OTC's return fire, Kheav pulled his gun and fired while trying to get safely to the van.

Kheav acknowledged that he fired his gun until it was empty, discharging probably 10 shots, but he claimed it was only to protect himself.

In addition, Kheav recalled that he saw Chhit had been shot and waved Oeurn to pull up the van so they could get Chhit into it. They then drove Chhit to Highland Hospital, where Kheav falsely told police that he was at home when he received a call from Moeun that Chhit was shot at a party.

### 2. Evidentiary Hearing

At a hearing in June 2022, the court found that Kheav made a prima facie showing of eligibility under section 1170.95, subdivision (c), and, with the parties' agreement, held an evidentiary hearing pursuant to section 1170.95, subdivision (d) the same day.

The court recognized that the prosecution had the burden to prove beyond a reasonable doubt that Kheav was guilty of murder or attempted murder under sections 188 and 189 as amended effective January 1, 2019. The court considered the transcript of Kheav's interview with the prosecutor, a video of the events, the amended information, and other material. The court also considered the appellate opinion in Oeurn's case for procedural and basic information (as offered by the prosecution and to which defense counsel did not object). The parties stipulated that the trial court could consider the appellate opinion's factual summary as well, supplemented by the evidence presented by the parties.

Kheav's attorney did not dispute that Kheav shared Mey's intent to shoot up the OTC house when they started out in the van. Instead, Kheav's argument was that Kheav had second thoughts and tried to lobby the others to return to the van without doing anything—both initially before someone spotted an OTC member's car, and right before the shooting began—and therefore he did not share Mey's intent at the time the shots were fired at the OTC house.

8

### 3. Court's Ruling

The court ruled that the prosecution proved, beyond a reasonable doubt, that Kheav was guilty of second degree murder under current law pursuant to a provocative act murder theory. The court found that, after learning an ASW gang member was shot at by a rival gang, Kheav and the others got into a van and went to the house where OTC was socializing to do a retaliation shooting; Kheav aided and abetted by being one of the several people who were armed with guns and by firing at the house; and Kheav shared in the ASW shooter's intent and intended to assist others in accomplishing their mission. Although the court did not find that Kheav acted with express malice, it found he acted with implied malice in the form of conscious disregard for human life, firing into a house where he knew there were people. He was therefore liable for the provocative conduct of Mouen in firing the first shot, which caused OTC members to return fire and kill Chhit. The court denied Kheav's resentencing petition. This appeal followed.

## II. DISCUSSION

Kheav contends the provocative act murder doctrine is no longer valid. He further contends that substantial evidence did not support the conclusion he committed provocative act murder. We review the trial court's factual findings for substantial evidence and its application of those facts to the statute de novo. (*People v. Cooper* (2022) 77 Cal.App.5th 393, 412.)

### A. Provocative Act Doctrine

"Under the provocative act doctrine, when the perpetrator of a crime maliciously commits an act that is likely to result in death, and the victim [of the provocation] kills in reasonable response to that act, the perpetrator is guilty of murder." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 655 (*Gonzalez*).) In other words, a provocative act murder occurs when the defendant's

9

"unlawful conduct provokes another into committing the fatal act." (*People v. Cervantes* (2001) 26 Cal.4th 860, 867, fn. 10.) The defendant who committed the provocative act is deemed the legal cause of the resulting death, and—important here—any accomplice in the underlying crime shares responsibility for the murder as an aider and abettor, even if the accomplice did not commit their own provocative act, if they acted with malice. (*People v. Mejia* (2012) 211 Cal.App.4th 586, 612 (*Mejia*).)

As Kheav acknowledges, several courts of appeal have held that the provocative act doctrine survives the changes made by SB 1437. (See, e.g., *People v. Mancilla* (2021) 67 Cal.App.5th 854, 867–868 ["For good reason, the argument provocative act murder is properly understood as a subset of the natural and probable consequences doctrine for purposes of Senate Bill 1437 and section 1170.95 has been rejected by every court of appeal that has considered it. . . ."]; *People v. Swanson* (2020) 57 Cal.App.5th 604, 612–617; *People v. Johnson* (2020) 57 Cal.App.5th 257, 267–268.)

Nevertheless, Kheav contends, "The provocative act murder doctrine is based on vicarious liability," and "changes in the law under SB 1437 and SB 775 no longer allow a non-provocateur, such as Kheav, to be vicariously liable under this theory." (Capitalization omitted.) Kheav contends the statutory amendments change vicarious liability both as to the mens rea element and the actus reus element. Kheav offers no authority for that proposition.

The purpose of SB 1437 was to limit murder convictions to instances where the defendant personally harbored malice—a mens rea element. (See § 189, subd. (e).) Although provocative act murder can be based on vicarious *conduct* (the conduct of the provocateur), it has always required that the defendant *personally* harbor malice. (*Mejia, supra,* 211 Cal.App.4th at p. 603 [as to the mental element of provocative act murder, the defendant must

10

personally possess malice when he causes the death through his provocative act or aids and abets the underlying crime of the provocateur who causes the death]; *Gonzalez, supra,* 54 Cal.4th at p. 655 ["[a] murder conviction under the provocative act doctrine . . . requires proof that the defendant personally harbored the mental state of malice"]; see *People v. Swanson, supra,* 57 Cal.App.5th at pp. 613, 617 [provocative act doctrine requires that the perpetrator personally exhibit a conscious disregard for life].) Because provocative act murder requires personal malice, it is consistent with the murder laws as amended by SB 1437.

B. Substantial Evidence of Provocative Act Murder

Ample evidence supported the conclusion that the prosecution proved, beyond a reasonable doubt, that Kheav was guilty of murder under the provocative act theory. Kheav and fellow gang members armed themselves and drove together to a house where they planned to confront a rival gang. After one of Kheav's accomplices (Moeun) opened fire, other gang members joined in, Kheav fired all ten bullets from his semiautomatic firearm, and return fire killed another one of Kheav's accomplices. Moeun's firing at the inhabited dwelling was the provocative act. Kheav aided and abetted the crime by accompanying Moeun and the other armed gang members to the scene of the shooting, and also by joining in the gunplay. Kheav personally harbored malice, implied from his conscious disregard of human life in joining his armed accomplices in their retaliation against their rival gang and shooting ten shots toward a house he knew was occupied.

Kheav nonetheless contends there was insufficient evidence that (1) his guilty plea was based on the provocative act doctrine and (2) he was an aider and abettor who acted with malice, particularly in light of evidence that he withdrew from the plan before the shooting and his age.

11

### 1. No Explicit Basis for the Plea

Kheav argues: "The record does not establish that Kheav's conviction by plea was based on a provocative act" doctrine "rather than an alternative theory, such as an aider and abettor of the target offense of shooting at an inhabited dwelling under the natural and probable consequences theory."

To the contrary, the record indicates strongly that Kheav's conviction by plea *was* based on the provocative act doctrine. Kheav's codefendants were prosecuted under a provocative act theory, suggesting the prosecutor had that in mind when accepting Kheav's plea. Throughout the section 1170.95 proceeding, Kheav's attorney repeatedly recognized that the prosecutor's theory was the provocative act doctrine. For example, in seeking extensions of time to submit briefing, defense counsel represented that "[t]he prosecution's theory of liability was clearly [the] Provocative Act Doctrine." In his last extension request, counsel asserted there was an issue "whether the provocateur in a provocative act murder can be eligible for relief under § 1170.95" and "the underlying facts show that Mr. KHEAV was not a provocateur, but rather *an accomplice to a provocateur*." (Italics added.) Defense counsel began his main brief by writing, "*In a provocative act case*, Mr. KHEAV was charged with murder on a theory that he was liable as an aider/abettor." (Italics added.) Counsel also argued in that brief: "Mr. KHEAV could only have liability for murder as a direct aider and abettor of the provocateur."

In any event, the point is not what theory the prosecutor and Kheav had in mind when Kheav pleaded guilty. Section 1170.95 asks whether, based on the evidence before the court at the hearing, the court can find beyond a reasonable doubt that the petitioner is guilty of murder under California law as amended by the changes to section 188 and 189 effective

12

January 1, 2019. (§ 1172.6, subd. (d)(3); former § 1170.95, subd. (b)(3).) As discussed *ante*, murder under the amended law includes provocative act murder. The question is therefore whether the evidence was sufficient to find provocative act murder beyond a reasonable doubt, which we discuss next.

## 2. Evidence of Aiding and Abetting with Implied Malice

As mentioned, an accomplice in the underlying crime shares responsibility for the murder as an aider and abettor of the provocateur, even if the accomplice did not commit their own provocative act, so long as they acted with malice. (*Mejia, supra*, 211 Cal.App.4th at p. 612.)[4]

Malice may be express or implied. (*People v. Clements* (2022) 75 Cal.App.5th 276, 299.) Malice is express "when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (§ 188, subd. (a)(1).) Malice is implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(2).) Implied malice has both a physical component (performing an act, the natural consequences of which are dangerous to life) and a mental component (knowing that the conduct endangers the life of another and yet acts with conscious disregard for life). (*Clements*, at pp. 289–290.) Kheav contends the evidence was insufficient for three reasons.

### a. Intent

Kheav argues there was insufficient evidence that he "had knowledge of and shared in the intent of the provocateur" because "[t]he only evidence in

---

[4]     The parties and the trial court assumed that the first shot by an ASW member (Moeun) was the provocative act. They did not consider whether Kheav's act of shooting at the house was an independent provocative act. It is not clear from the evidence whether Chhit was shot before or after Kheav started shooting.

the record regarding Kheav's state of mind were his statements to the district attorney's office." (Capitalization omitted.) We disagree.

There was no dispute, even based on Kheav's own statement to the prosecutor, that Kheav and his fellow gang members armed themselves and went to the house to confront rival gang members who had fired at Mey. Kheav's counsel acknowledged to the trial court, "As [Kheav] rode in the van as a passenger, his only intent was to help his friends shoot up a house as a statement in retaliation for the earlier shooting . . . ." Nor is there any dispute that Kheav knew there were people at that house. Evidence that Kheav and his accomplices armed themselves and sought to avenge the attack on Mey by shooting up an inhabited residence would support an inference of premeditation. (See *People v. Rangel* (2016) 62 Cal.4th 1192, 1213 [where defendant and his son armed themselves, searched for the victim to kill him, found the victim's house, and continued with their plan to kill him despite the presence of others, there was substantial evidence that defendant premeditated the death of the victim and anyone who interfered].)

Moreover, there was no dispute that the group positioned themselves across the street from the house where they thought OTC members were located. After Moeun fired, there were dozens of gunshots back and forth, including approximately 10 rounds from Kheav. It was reasonable for the court to conclude, beyond a reasonable doubt, that Kheav shared his accomplice's malice in intending to shoot a rival gang member, or at least acted with conscious disregard for life.

Kheav points to evidence that he believes shows otherwise: he told the prosecutor he did not know what was going to happen when he accompanied the armed gang members to confront the rival gang; he was just 20 years old; he was not an actual member in the gang; he went with the gang on their

14

retaliation mission because his friend Chhit wanted to go; no one explicitly announced in the van that they were going to kill or shoot anyone; he had no adult criminal record and his only juvenile offenses were for theft; and there was no evidence he previously engaged in gang retaliation or violent crime. He further argues that the fact he and the others carried firearms did not prove he shared an intent to shoot because he carried a firearm all the time. It is not our role, however, to reweigh the evidence. The evidence cited by the trial court constituted substantial evidence from which a trier of fact could reasonably conclude, beyond a reasonable doubt, that Kheav committed provocative act murder.

In a similar vein, Kheav argues his act of firing his gun did not assist the provocateur, because OTC members started shooting immediately once Moeun fired, and Kheav only shot back in self-defense. The court was not obligated to believe Kheav's statement. In fact, evidence at trial suggested the events were not as Kheav described. As we stated in Oeurn's and Mey's appeal (in the statement of facts to which the parties stipulated), "Von [Neak] finished loading his weapon and moved toward the attackers as the *group* [of ASW associates] fired several more shots that shattered the windows of the cars near Von." (Italics added.) Under our substantial evidence review, we indulge all reasonable inferences in support of the trial court's ruling.

### b. *Kheav's Claim That He Wanted to Withdraw*

Kheav argues that the prosecution failed to prove beyond a reasonable doubt that Kheav did not withdraw from the crime. (Citing *People v. Fiu* (2008) 165 Cal.App.4th 360, 385 [where defense of withdrawal is asserted, the court should instruct the jury that they should acquit if they have a reasonable doubt whether the defendant effectively withdrew].) In the trial court, Kheav similarly argued that he no longer shared the requisite mental

15

state by the time Moeun started shooting. To support these arguments, Kheav contends: "even if Kheav initially went with the group to the house party location knowing the gang members intended to retaliate by firing shots, he expressly stated an intent to withdraw from that act and, in fact, started to walk away before shots were fired."

Kheav mischaracterizes the evidence. Although Kheav and his gang associates started to walk away, it was only because they did not think the OTC gang members were there. Once they saw an indication that the rival gang was there, however, Kheav and the others *went back to the house.* That is not evidence of withdrawal; it is evidence confirming Kheav and the others wanted to confront OTC.[5]

After returning with his gang associates to a position across the street from the house, Kheav did not walk away again before Moeun fired at Von. To the contrary, Kheav claimed in his interview that he was only *"gettin' ready* to turn around and leave and, like, Scott [Moeun], just pulled his gun out" and fired; at some point shortly after that, Kheav joined in the fray and emptied his semiautomatic pistol at the rival gang. (Italics added.)

Moreover, Kheav fails to establish that what Kheav purportedly said or did constituted withdrawal under the law. As Kheav acknowledges, withdrawal requires the defendant to notify those involved that he is no

---

[5]     At the resentencing hearing, defense counsel argued there was "a little bit of proof" that Kheav "tried to lobby the others into going back to the van without doing anything," because a video showed that the group started to walk back to the van. Kheav says the judge agreed that the video was "consistent with what Mr. Kheav said in his statement." Actually, the court stated: "Well, on the video, you see them *walk towards the back van,* and it's consistent with what Mr. Kheav said in his statement" (italics added), which shows that the court was referring to the time the gang started to walk back to the van *before* Kheav and the others returned to the house.

longer participating in the crime and to do *everything in his power to prevent the crime*. (CALCRIM No. 401; *People v. Ross* (1979) 92 Cal.App.3d 391, 405.) Kheav offers no legal authority that merely telling one of the accomplices (or even all of them) "let's go" is sufficient to constitute withdrawal. Nor was the court required to believe that Kheav really made such a statement to Chhit.

In sum, notwithstanding the evidence of "withdrawal," substantial evidence supported the conclusion, beyond a reasonable doubt, that Kheav harbored the requisite mental state for provocative act murder.

### c. *Youthfulness*

Kheav, who was 20 years old at the time of the shooting, contends the trial court should have considered his youth "as a factor in deciding whether the prosecution proved the mens rea element to convict him of murder under current law." (Capitalization omitted.) His argument is unavailing for multiple reasons.

First, Kheav cites no legal authority for the proposition that his age must be specifically considered in determining whether he acted with malice in this context. Although youthfulness is a factor considered for purposes of liability as a major participant who acted with reckless indifference to human life (*In re Moore* (2021) 68 Cal.App.5th 434, 453–454), and his age will be relevant to his level of culpability and eligibility for parole (see § 3051), youthfulness has not been made a separate factor in deciding whether he acted with malice.

Second, Kheav has not shown that, if the court was required to consider his youth, the court failed to do so. As Kheav notes, the court held a hearing pursuant to *People v. Franklin* (2016) 63 Cal.4th 261 before the resentencing hearing, to preserve information for purposes of parole consideration. Although the hearing was not contemporaneous with the section 1170.95

17

evidentiary hearing, the same judge presided over both.  To the extent Kheav's youthfulness was germane, it is reasonable to infer that the court considered it, with the rest of the evidence, in concluding he acted with implied malice.  (See *In re Julian R.* (2009) 47 Cal.4th 487, 499 [presumption that the court knew of and followed the law].)

Third, there is no indication Kheav could have shown that, due to his age, he was unaware that firing 10 bullets at an occupied house was dangerous to human life.  If there was any error in failing to consider his youthfulness, Kheav has not demonstrated that it was prejudicial.

## III.  DISPOSITION

The order is affirmed.

_____

Langhorne, J. *

We concur:

_____

Jackson, P.J.

_____

Simons, J.

*People v. Kheav* / A165542

*      Judge of the Superior Court of Napa County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19