Filed 7/14/22  P. v. Lopez CA4/2
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

STEVEN LOPEZ,

    Defendant and Appellant.

E071797

(Super.Ct.No. INF1600709)

OPINION

APPEAL from the Superior Court of Riverside County.  Anthony R. Villalobos, Judge.  Affirmed in part; reversed in part and remanded for resentencing.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland and Charles C. Ragland, Assistant Attorneys General, Eric A. Swenson and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Steven Lopez was found guilty of second degree murder and the jury found true the special allegation that he personally used a firearm causing great bodily injury or death within the meaning of Penal Code[1] section 12022.53, subdivision (d), for shooting the victim while at a friend's house.

Defendant filed an appeal claiming (1) the trial court erred and violated his federal due process rights by admitting a statement made by one of the witnesses, Daniel Soto, to another witness on the night of the shooting, that he had seen defendant at the house where the shooting occurred, in order to attack Soto's credibility pursuant to Evidence Code section 1202; (2) the trial court gave conflicting instructions on the permissible use of Soto's statement to another witness in violation of defendant's federal constitutional due process rights requiring reversal of his conviction; (3) the trial court erred by instructing the jury with CALCRIM No. 315 that it could consider a witness's certainty in his or her identification in evaluating identification testimony; (4) cumulative errors that occurred at trial warrant reversal; (5) the trial court erred by refusing to consider reducing his conviction of personally using a firearm under section 12022.53, subdivision (d), to a lesser firearm enhancement; (6) defendant contends remand to the trial court is necessary for it to conduct an ability to pay hearing for the restitution fine and court operation fees imposed in light of *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*); and (7) if this court does not remand under *Dueñas*, this court should order the restitution fine that was imposed by the trial court pursuant to Penal Code section 1202.4,

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

subdivision (b), and the parole revocation fine imposed pursuant to Penal Code section 1202.45 be reduced from $1,000 to $300, the minimum fine.

In an unpublished opinion *People v. Steven Lopez* (Jul. 28, 2020, E071797) [nonpub. opn.] (Opinion) we ruled—based on the state of the law at the time—that the trial court only had discretion to strike or impose the section 12022.53, subdivision (d), enhancement and affirmed his sentence. We rejected defendant's remaining issues ordering only that the abstract of judgment be modified. Defendant filed a petition for review, which was granted on the sole issue of whether the trial court had the discretion to reduce the conviction of personally using a firearm pursuant to section 12022.53, subdivision (d), to a lesser firearm enhancement that was not charged.

On April 27, 2022, the California Supreme Court transferred the matter back to this court with instructions to vacate our previous decision in its entirety and reconsider the cause in light of *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*), which concluded that trial courts are permitted to strike a firearm enhancement under section 12022.53, subdivision (d), and impose a lesser, uncharged firearm enhancement in its place.

The parties filed supplemental briefs. Defendant argues that because the record in this case shows the trial court was unaware at the time of sentencing that it could strike the section 12022.53, subdivision (d), enhancement and impose a lesser included enhancement, we must remand the matter to allow the trial court to exercise that discretion. The People concede that remand is appropriate. We concur. We remand the matter to the trial court with directions.

3

# PROCEDURAL HISTORY

Defendant was found guilty of one count of second degree murder (§ 187; count 1). The jury also found true the special allegation that defendant personally used a firearm causing great bodily injury or death within the meaning of section 12022.53, subdivision (d).[2] Defendant was sentenced to 40 years to life.

# FACTUAL HISTORY[3]

## A. THE SHOOTING

Meza was friends with defendant, Daniel Soto and the victim. On May 26, 2016, Meza rented a room in a house on Calle Zafiro in Indio. On that evening the victim and Soto both contacted Meza and said they wanted to come to his house to hang out. Soto wanted to bring some girls with him. After the victim arrived at Meza's house, he called defendant. Defendant arrived at Meza's house about 20 minutes later. Meza, the victim and defendant were all in Meza's bedroom.

Meza, the victim and defendant were all getting along and talking. The victim and defendant both had guns that they were showing off to each other. The gun possessed by defendant would have taken .40- or .45-caliber bullets. There was no tension between the victim and defendant. Soto showed up about 10 minutes later. Soto looked into the room when he arrived; Meza indicated defendant was still in the room. Meza went with Soto

---

[2] Section 12022.53 was amended effective January 1, 2022. (Stats. 2021, ch. 626 (A.B. 1171), eff. Jan. 1, 2022.) None of the changes impact the issues in this case. We refer to the current version of section 12022.53 when referenced.

[3] We present the same facts as we did in the Opinion.

4

to the kitchen. Defendant and the victim stayed in Meza's room. A few minutes later, Meza heard gunshots.

Meza saw the front door open and went outside. The victim was kneeling on the ground holding his stomach. The victim told Meza to take him to the hospital. At that point, Meza saw defendant get on his motorcycle and ride away. Defendant said nothing and did not try to help the victim. Defendant had on a black helmet. Meza went inside to get his keys and told Soto that the victim had been shot. Meza drove the victim to the hospital.

Meza indicated that defendant owned a green and black motorcycle. It was old and had a modified exhaust to make it loud. Meza did not actually see defendant shoot the victim. The victim never told Meza who had shot him.

On May 26, 2016, at around 10:00 p.m., the victim told Soto to meet him at Meza's house.[4] Soto brought four girls with him to the house in his car. When Soto arrived, the victim and Meza were in Meza's bedroom; Soto did not see defendant. Meza and Soto went to the kitchen to drink beer and smoke marijuana with the girls. The victim did not join them. At some point, Soto observed the victim walk out the front door. The victim was talking on the phone. Approximately one minute later, Soto heard gunshots. Soto went out to the front yard and saw the victim holding his stomach. Soto

---

[4] Soto refused to testify at trial. No immunity was given to Soto because he had pending criminal charges in another case. The trial court found him unavailable and agreed to allow the preliminary hearing testimony be read to the jury.

gathered the four girls and they left.  Soto took the girls home and then went to the hospital.

Soto did not recall seeing a motorcycle at the house that night and claimed he did not know anyone who drove a black and green motorcycle.  He knew defendant from high school but he was not a close friend.  He had never seen defendant on a green motorcycle.

On May 26, 2016, at around 11:30 p.m., Darrian Wilford, Adriene Sanchez, Anesha Smith and Ashleigh Smith all went with Soto to Meza's house.  The four girls hung out in the kitchen drinking beer and smoking marijuana with Soto and Meza.  Meza left the kitchen several times.

While they were in the kitchen, Wilford, Ashleigh[5] and Sanchez heard gunshots.  The gunshots were coming from outside.  All of the girls hid in a closet thinking it was a drive-by shooting.  Soto yelled to the girls that they had to leave.  They all got in Soto's car and left.  Meza had already left in his own car.  Soto told them that the victim had been shot.  Meza was not in the kitchen when they heard the gunshots.  Sanchez did not see Meza or the victim when she left the house.

Sanchez thought she saw a three-wheel motorcycle in the driveway or at the neighbor's house when they arrived.  Sanchez, Ashleigh and Wilford did not see anyone

---

[5]  We use Ashleigh's first name as she shares a last name with her sister; no disrespect is intended.

else in the house besides Meza and Soto.[6]  Ashleigh thought she saw a red or black motorcycle parked in the driveway when they arrived at the house.  Wilford admitted she had seen a green and black motorcycle at the house.  Wilford heard a motorcycle after the gunshots that appeared to be driving away from the residence.  Wilford never saw defendant at the house.  Ashleigh told the police later that Soto told her defendant was at the house that night.

Becky Marx lived on Calle Zafiro in Indio on May 27, 2016, with her boyfriend Peter Ali.  She was a trained paramedic and he was a former police officer.  He had specialized in teaching officers how to ride motorcycles.  Marx and Ali were outside their house around 12:30 a.m. with some of their neighbors when they heard gunshots.  Marx walked to the end of the driveway and could see up the street into the yard of Meza's house.  She saw somebody standing in front of the house holding a gun with both hands shooting toward the house.  She saw the muzzle flashes.  The shooter was not moving or running.  Marx heard no one shouting or yelling.

The shooter got on a motorcycle that was parked in front of the house.  Marx and Ali ran back up their driveway when the shooter on the motorcycle started coming down the street toward them.  Ali described the sound of the motorcycle as loud and it looked like an old style motorcycle.  It was dark in color, either black or dark green.  Marx also indicated that the motorcycle was loud.  Marx and Ali had heard a motorcycle earlier in the night around 11:00 or 11:30.

---

[6]  Sanchez knew defendant from school.  Ashleigh denied that she knew defendant.  Wilford knew defendant through his brother.

7

Marx and Ali walked down to Meza's house. They saw blood on the sidewalk, shell casings on the ground and a gun was on the lawn. The gun was not where the shooter was seen by Marx. Ali believed it was a .38-caliber gun. There was no shooting victim.

Ali did not recall describing the person on the motorcycle to the police as being 40 to 50 years old, white and not wearing a helmet; defendant did not meet this description. At trial, Ali believed the person on the motorcycle was wearing a helmet.

Daniel Franks rented the room in the house on Calle Zafiro to Meza. Franks was in the backyard on his phone when he heard "three pops" in the front yard. He then heard a motorcycle or dirt bike take off and then heard someone crying for help. Meza and the victim had already left by the time Franks got to the front of the house.

Charles Cash was the apartment manager at the apartment complex where defendant and his brother Alex Lopez lived. They both rode motorcycles. He saw defendant on May 26, 2016, at 2:30 p.m. riding an older model motorcycle that was green and black. The motorcycle was "super loud." A neighbor of Meza's heard a motorcycle leaving at around 12:30 a.m.

B.    INVESTIGATION

Indio Police Detective Fuentes was called to the hospital where the victim was taken. The victim died at the hospital from multiple gunshot wounds to his torso, buttocks, right arm, and left arm.

Detective Fuentes spoke with Soto and Meza at the hospital around 2:30 a.m. Soto told him they should be looking for a Hispanic man with a green and black racing-

8

style motorcycle. He recommended that Detective Fuentes speak with the victim's family and they would know the person on the motorcycle.[7] The victim was close friends with the person on the motorcycle but Soto refused to give Detective Fuentes his name. Soto never told Detective Fuentes that defendant had been in the house.

Meza did not tell officers at the hospital that defendant was at the house and on a motorcycle that night because he was scared. He initially lied to officers. He told officers at the hospital that the victim went outside five minutes before he was shot but that was a lie. On May 27, 2016, after the victim died, Meza told detectives defendant was present at the house the night of the shooting.

Detective Fuentes also spoke with Sanchez. Sanchez told Detective Fuentes and Gomez that she saw a black, racing-style motorcycle in the driveway and she heard a motorcycle after the shooting. She also stated she saw a gun on the grass.

Ashleigh spoke with Detective Fuentes the day after the shooting. She told Detective Fuentes that she saw a "guy" on a green motorcycle. She also told Detective Fuentes that she knew defendant through her little brother. She was told by Soto that defendant was at the house in the bedroom with the victim that night. Ashleigh told Detective Fuentes she never saw defendant at the house.

The victim's mother, sister and brother told Detective Fuentes at the hospital that one of the victim's friend's, defendant, had either a green, or black and green motorcycle. Defendant was like a brother to the victim.

_____

[7] At trial, Soto did not recall telling an officer that he should talk to the victim's mother.

Indio Police Lieutenant Haynes spoke with Ali the morning after the shooting. Ali told him the rider had no helmet on, was 40 to 50 years old and had long hair pulled back. Marx was unable to give a description. On May 30, 2016, Ali and Marx could not identify the person on the motorcycle from the six-pack photographic lineup, which consisted of Hispanic males, including defendant.

Defendant was apprehended in a car being driven by his girlfriend on May 30, 2016. The vehicle was searched. Hidden in a panel on the passenger's side of the vehicle where defendant had been sitting was a key to a Kawasaki motorcycle and a .38-caliber gun. The gun was not registered to defendant.

Video surveillance from neighbors near the time of the shooting was obtained. A motorcycle was seen in the video around the time of the shooting. Also video surveillance was obtained from a school by defendant's apartment complex, which showed a motorcycle traveling down the road between 12:30 and 1:00 a.m.

On April 16, 2016, a green and black Kawasaki motorcycle was seen parked near defendant's apartment but defendant was not confirmed as the owner of the motorcycle.

Shell casings found at Meza's house were from a .45-caliber gun. The casings were all found close to each other showing the shooter stayed in the same place. No other caliber of expended casings was found. The victim's DNA was found on the .38-caliber gun that was on the lawn at Meza's house. The gun was operable. No DNA or fingerprints were found on any other items tested. The gun found in defendant's possession when he was arrested would not have matched the shell casings found on the

10

lawn. After May 27, 2016, defendant was not found in possession of a green and black motorcycle.

## DISCUSSION[8]

A.      ADMISSION OF SOTO'S PRIOR IDENTIFICATION

In appellant's opening brief, defendant insisted the trial court erred and violated his federal Constitutional due process rights by admitting testimony by Ashleigh—that Soto had told her on the night of the shooting that defendant was present at the home—to attack Soto's credibility.

1.      *ADDITIONAL FACTUAL HISTORY*

During trial, prior to the testimony of Ashleigh, the prosecutor sought a ruling on the admissibility of her testimony that Soto, on the night of the shooting, kept going into a bedroom in the house and would come back and advise her and the others that defendant was in the bedroom. Ashleigh told this information to Detective Fuentes and another detective when she was interviewed shortly after the victim's murder. During Soto's preliminary hearing testimony, he denied that defendant was at the house. The prosecutor argued Ashleigh's testimony would impeach Soto's credibility. The prosecutor was not seeking to admit the statement for its truth. The prosecutor relied on Evidence Code section 1202 and acknowledged that a limiting instruction pursuant to CALCRIM No. 319 would need to be given.

---

[8] Despite the California Supreme Court granting review only to address the section 12022.53 sentencing issue, it ordered this court to vacate its decision in its entirety. Accordingly, we must present the other issues raised by defendant that were already decided in our Opinion.

11

Defense counsel responded that Ashleigh's testimony should be excluded as more prejudicial than probative pursuant to Evidence Code section 352. The issue in the case was identification and it would be impossible for the jurors to simply consider the evidence for impeachment purposes rather than to the issue in the case of identification. The prosecutor responded that Soto's statement was not more prejudicial than probative. It was admissible to show Soto was not credible and it did not identify defendant as the shooter; it only showed defendant was present. The prosecutor noted that Meza was going to testify that defendant was present and defense counsel likely was going to attack Meza's credibility; the People were entitled to attack Soto's credibility.

The trial court found the statement admissible under Evidence Code section 1202. As for Evidence Code section 352, it ruled "I do have some concern that the jury will confuse the purpose that that statement is being allowed in. But it does appear, given the issues here in this case, that that would be more probative than prejudicial, even though, I mean, it's very close here. But given the way that this has panned out, I'm going to go ahead and allow it." Defense counsel asked that CALCRIM No. 319 include that the evidence could not be used for identification.

When Ashleigh testified, she was asked by the prosecutor if she was told that defendant was at the house that night. Defense counsel objected on hearsay grounds. The prosecutor responded it was not being offered for its truth and only for the credibility of Soto. At that point, the trial court admonished the jurors, "Daniel Soto did not testify in this trial, but his testimony taken at another time was read for you. In addition to this testimony, you have heard evidence that Daniel Soto made another statement. I am

12

referring to the statement about which Ashleigh Smith testified. If you conclude that Daniel Soto made the other statement, you may only consider it in a limited way. You may only use it in deciding whether to believe the testimony of Daniel Soto that was read here at trial. You may not use that other statement as proof that the information contained in it is true, nor may you use it for any other reason, including identity of the perpetrator." Ashleigh then testified that Soto told her defendant and the victim were in the back bedroom on the night of the shooting.

When Detective Fuentes testified about his interview with Ashleigh, he testified that Soto had told Ashleigh that defendant was present at the house. The trial court gave the same limiting instruction it had given when Ashleigh testified. At the time the trial court gave the instructions to the jury, it again gave CALCRIM No. 319.

2.  *ADMISSIBLITY OF THE EVIDENCE*

Evidence Code section 1202 provides that "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct. Any other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing. For the purposes of this section, the deponent of a deposition taken in the action in which it is offered shall be deemed to be a hearsay declarant." Admission of a prior inconsistent statement under

13

Evidence Code section 1202 is for the limited purpose of impeachment and not for the truth of the matter.  (*People v. Blacksher* (2011) 52 Cal.4th 769, 806.)

Defendant appears to concede that the evidence was admissible under Evidence Code section 1202.  Nonetheless, defendant insists the trial court erred by admitting the evidence as it was more prejudicial than probative under Evidence Code section 352.

"Under Evidence Code section 352, a trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time.  'Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." ' "  (*People v. Riggs* (2008) 44 Cal.4th 248, 289-290.)  "When an objection to evidence is raised under Evidence Code section 352, the trial court is required to weigh the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption.  Unless these dangers 'substantially outweigh' probative value, the objection must be overruled."  (*People v. Cudjo* (1993) 6 Cal.4th 585, 609.)

"A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

Here, the trial court did not abuse its discretion by allowing Ashleigh and Detective Fuentes to testify Soto had told Ashleigh that defendant was in the bedroom

14

with the victim on the night of the shooting. Soto denied in his preliminary hearing testimony that he saw defendant at the house the night of the shooting. He testified only Meza and the victim were in the bedroom together that night. Ashleigh testified that after Soto went to Meza's bedroom, Soto came back and told them that defendant was in the bedroom. This evidence was admissible to attack Soto's credibility. As noted by the prosecutor, defense counsel would seek to attack Meza's credibility. The evidence was clearly probative for the purpose of impeaching Soto's credibility.

Further, the evidence was not more prejudicial than probative. The fact Soto told Ashleigh that defendant was present in Meza's bedroom did not confirm that defendant was the shooter as no one witnessed the shooting. Further, it did not result in an undue consumption of time because it was just a brief statement brought out through Ashleigh's testimony and confirmed by Detective Fuentes.

Additionally, as noted, the jury was instructed on numerous occasions that it could not use the evidence for the truth of the matter that defendant was present and was the shooter. The jury was specifically instructed "You may not use that other statement as proof that the information contained in it is true, nor may you use it for any other reason, including identity of the perpetrator." We presume the jurors followed the instructions and did not consider the evidence as identification evidence but for the proper purpose of impeachment. (*People v. Wilson* (2008) 44 Cal.4th 758, 803 ["We of course presume 'that jurors understand and follow the court's instructions' "].) As such, the trial court did not abuse its discretion by admitting Ashleigh's testimony.

15

Defendant relies on *People v. Ross* (1979) 92 Cal.App.3d 391 (*Ross*). In *Ross*, defendants Ross and Atkins entered the apartment of the 90-year-old-victim, killing the victim and setting the apartment on fire. They were charged with murder, robbery, burglary and arson, with a penalty enhancement that the murder was committed by means of torture with an intent to kill. (*Ross*, *supra*, 92 Cal.App.3d at p. 397-398.) At trial, Ross's postarrest statement was admitted into evidence wherein he admitted he committed burglary and robbery but denied being involved in the murder or arson; Atkins had beaten the victim and started the fire. Ross did not testify but called Atkins's roommate to testify that Atkins had confessed his guilt to him and did not mention another participant, to show Ross was not involved in the murder and arson. (*Id.* at p. 399.) On rebuttal, the prosecutor introduced, pursuant to Evidence Code section 1202, two in-custody statements Atkins had made in which he admitted his guilt to the burglary and robbery, denied he was involved in the arson and murder implicitly blaming Ross for these actions, and denied that he confessed to his roommate. (*Ross*, at p. 399.)

On appeal, the appellate court agreed that the two in-custody statements by Atkins were admissible pursuant to Evidence Code section 1202. However, it found the testimony should have been excluded pursuant to Evidence Code section 352 because of the substantial danger of prejudice and confusion of the jury but provided no further elaboration. (*Ross*, *supra*, 92 Cal.App.3d at p. 407.) The appellate court found that the error was compounded by argument from the prosecutor that Atkins's in-custody statements were true statements. It concluded the failure to exclude the evidence was an abuse of discretion. (*Ibid*.)

This case differs from *Ross*. Here, the jury was repeatedly admonished it could not consider Ashleigh's statement for its truth and the prosecutor did not argue that her statement should be considered for its truth. Moreover, this evidence did not identify defendant as the shooter, which differs from the testimony of a codefendant trying to exonerate himself. The testimony by Ashleigh was properly admitted and was not more prejudicial than probative.

### 3. *HARMLESS ERROR*

Defendant contends the admission of the evidence violated his right to due process and must be reviewed for prejudice pursuant to the beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24. However, "We [normally] review evidentiary errors for prejudice by determining whether it was reasonably probable that a jury would have returned a more favorable verdict for defendant had the court not admitted the evidence." (*People v. Felix* (2019) 41 Cal.App.5th 177, 187; see also *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Admission of Soto's statement did not render defendant's trial so fundamentally unfair as to constitute a due process violation. "To prove a deprivation of federal due process rights, [a defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citation.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose' [Citation.] 'The dispositive issue is . . .

17

whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process.' " (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229-230.) Here, the evidence was relevant to Soto's credibility, a permissible inference from the evidence, and it was not of such quality that it impeded defendant's right to a fair trial. As such, we review prejudice under *Watson*, e.g. the evidentiary error is harmless unless it is reasonably probable defendant would have received a more favorable result absent the error or errors. (*People v. Felix*, *supra*, 41 Cal.App.5th at p. 187.)

Even if the jury did consider that defendant was present by relying on Ashleigh's statement, other credible evidence supported that defendant was the shooter. Initially, even if the jury considered Soto's testimony, it only identified defendant as being present in the house and not as the shooter. This same evidence was provided by Meza who testified that defendant was present with the victim in the room prior to the shooting. Circumstantial evidence supported that defendant was the shooter. Defendant was in possession of a handgun that would shoot .45-caliber bullets just prior to the shooting and all of the shell casings found on the lawn after the shooting were .45-caliber. Meza observed defendant leaving on his motorcycle after the shooting and he did not stop to help the victim despite them being best friends. Several of the girls saw a motorcycle in the driveway when they arrived at Meza's house. Wilford heard a motorcycle driving from the house after the shooting. Both Ali and Marx indicated that after the shooting, the shooter left on a motorcycle. Although their descriptions of the person on the motorcycle and the type of motorcycle were different from Meza and the girls, it

18

confirmed that the shooter was riding a motorcycle that night, corroborating Meza's testimony. Finally, video surveillance showed a motorcycle near the scene of the shooting and near defendant's apartment complex around the time of the shooting. Defendant had been seen during the day of the shooting riding a green and black motorcycle.

Based on the foregoing, even if the jury considered that Ashleigh's statement identified defendant as being present at the house that night, it is not reasonably probable that defendant would have received a favorable verdict had the statement been excluded as other credible evidence supported defendant's conviction.

### B. INCONSISTENT INSTRUCTIONS ON SOTO'S TESTIMONY

Defendant further contended in the opening brief that the trial court erred and violated his federal Constitutional due process rights by giving conflicting instructions on the limited purpose of Soto's prior statement that he saw defendant at the house. He insists that despite the jury being instructed three times as to the limited purpose for which it could use Soto's statement pursuant to CALCRIM No. 319, they also were instructed with CALCRIM Nos. 317 and 318, which conflicted with CALCRIM No. 319.

#### 1. *ADDITIONAL FACTUAL HISTORY*

The jury was instructed with CALCRIM No. 317 that "The testimony of Daniel Soto, as given under oath, was read to you because he is not available. You must evaluate this testimony by the same standards that you apply to a witness who testified here in court." They were also instructed with CALCRIM No. 318 that "You have heard evidence of statements that a witness made before the trial. If you decide that the witness

19

made those statements, you may use those statements in two ways: [¶] 1. To evaluate whether the witness's testimony in court is believable; and, [¶] 2. As evidence that the information in those earlier statements is true."

Prior to the trial court giving CALCRIM No. 319, the jury was instructed "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and no other." The trial court also gave the limiting instruction pursuant to CALCRIM No. 319 for the third time when giving all the instructions. They were again advised, "Daniel Soto did not testify in this trial, but his testimony, taken at another time, was read for you. In addition to this testimony, you have heard evidence that Daniel Soto made another statement. I am referring to the statement about which Ashleigh Smith testified regarding Daniel Soto telling her that [defendant] was in the back bedroom with [the victim]. [¶] If you conclude that Daniel Soto made that other statement, you may only consider it in a limited way. You may only use it in deciding whether to believe the testimony of Daniel Soto that was read here at trial. You may not use the other statement as proof that the information contained in it is true, nor may use it for any other reason, including identity of the perpetrator." Both the prosecutor and defense counsel requested these instructions.

### 2. ANALYSIS

Initially, the People contended in the Respondents' Brief that defendant forfeited this claim by agreeing to the instructions below and failing to request clarification of the instructions. Anticipating such a claim, defendant contended in his opening brief that the erroneous instructions affected his substantial rights, forgiving the failure to object; or in

20

the alternative, if he is found to have forfeited the claim, he received ineffective assistance of counsel. It is true that defendant's counsel requested that the three instructions be given, and did not request any modifications. However, in order to foreclose a lengthy discussion on forfeiture and ineffective assistance of counsel, we will address the merits.

"In reviewing the purportedly erroneous instructions, 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " (*People v. Frye* (1998) 18 Cal.4th 894, 957, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, quoting *Estelle v. McGuire* (1991) 502 U.S. 62, 72.) "When reviewing ambiguous instructions, we inquire whether the jury was 'reasonably likely' to have construed them in a manner that violates the defendant's rights." (*People v. Rogers* (2006) 39 Cal.4th 826, 873.)

In this particular case, the jury could reasonably interpret CALCRIM No. 317, which instructed that Soto's testimony was read to the jury because he was unavailable at trial but such testimony should be evaluated under the same standards as testimony given in trial, only applied to Soto's preliminary hearing testimony, and that CALCRIM No. 319 only applied to his statement to Ashleigh. The prosecutor made this clear during opening argument. The prosecutor stated, as to Ashleigh's statement, "What are you allowed to do with that information? Right? Well, CALCRIM 319 tells us you can use this statement to assess the credibility of Daniel Soto's testimony that was read to you. So when it was read to you and Daniel Soto says [defendant] wasn't there, you're allowed to use this piece of information that Ashleigh says, 'Hey, that very night Daniel

21

said he was back there in that back room with [the victim].' You're allowed to use that to determine whether or not Daniel Soto was telling the truth when he testified." The court can assume that "counsel's arguments clarified an ambiguous jury charge." (*Middleton v. McNeil* (2004) 541 U.S. 433, 438.)

The jury was properly instructed on how to view Soto's preliminary hearing testimony and it did not conflict with CALCRIM No. 319. There was no apparent constitutional violation in the giving of CALCRIM Nos. 317 and 319 based on the particular facts of this case.

As for CALCRIM No. 318, it advised the jurors that in evaluating statements made prior to trial that were admitted, it could use those statements in two ways: "1. To evaluate whether the witness's testimony in court is believable; and, [¶] 2. As evidence that the information in those earlier statements is true." Here, the first use, evaluating whether the witness was credible, was the same as CALCRIM No. 319.

As for the second use, that the earlier statements could be considered for their truth, could be considered to conflict with CALCRIM No. 319, which specifically advised the jury it could only use Soto's statement prior to trial that defendant was in Meza's bedroom to impeach Soto's credibility. Even if there was ambiguity, "the question is whether there is a ' "reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " (*People v. Mills* (2012) 55 Cal.4th 663, 677.) In order for the jury to have considered CALCRIM No. 318 applied to Soto's statement to Ashleigh, it would have had to ignore the directive of CALCRIM No. 319 that was given three times, two of which were given at the same time

as the testimony. Further, it would have to ignore that it was instructed that some evidence was admitted for a limited purpose and could only be considered for that purpose, which was given just prior to CALCRIM No. 319. It is inconceivable the jurors ignored the directive of CALCRIM No. 319, which was given in conjunction with the testimony and relied on the pattern CALCRIM No. 318 instruction in its place.

Here, the jury would have had to conclude that CALCRIM No. 319 was superfluous and ignore its explicit directive, given three times to the jury, that Soto's statement could only be considered to impeach his credibility. There is no reasonable likelihood that the jury considered Soto's statement to Ashleigh for its truth based on the instructions. (*People v. Frye*, *supra*, 18 Cal.4th at p. 957.) There was no constitutional violation based on the instructions given in this case.

C.     CALCRIM NO. 315 — CERTAINTY IN IDENTIFICATION

Defendant insisted in his opening brief that the standard CALCRIM No. 315 instruction on eyewitness identification violated his state and federal due process rights because it advised the jurors that an eyewitness's certainty in identifying a defendant is a factor the jury can consider in evaluating truthfulness and accuracy of the eyewitness's testimony. In the Opinion, we found that this court was bound by the California Supreme Court case of *People v. Sanchez* (2016) 63 Cal.4th 411, 462 (*Sanchez*), which approved of the language in CALCRIM No. 315. While this case was pending before the California Supreme Court, it decided *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*) which confirmed that CALCRIM No. 315 does not violate a defendant's federal and state due process rights to a fair trial.

23

Here, the jury was instructed with CALCRIM No. 315 about eyewitness identification. That instruction stated, "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: . . ." One of these questions was, "How certain was the witness when he or she made an identification?" The instruction was requested by both parties.

In the Opinion, we concluded that the inclusion of the certainty language in CALCRIM No. 315 did not prejudice defendant as it is not reasonably probable that he would have received a more favorable result had the instruction excluded the certainty factor. (*Sanchez*, *supra*, 63 Cal.4th at pp. 462-463.) Initially, as in *Sanchez*, the challenged instruction was presented in a neutral manner and did not equate the certainty of the witness's identification with its accuracy. (*Id.* at p. 462.) Further, Meza, who testified that defendant was at the house before the shooting, knew defendant personally. As such, there was no question that if he saw defendant at the house, he knew it was defendant. Moreover, Meza did not identify defendant as the shooter as he did not see defendant shoot the victim. As previously stated, circumstantial evidence supported that defendant was the shooter. Defendant was in possession of a handgun, which used the same type of bullets that matched the shell casings found after the shooting; defendant was seen by Meza leaving on his motorcycle after the shooting; and numerous other witnesses stated that a motorcycle was at Meza's house and left after the shooting.

In *Lemcke*, *supra,* 11 Cal.5th 644, the California Supreme Court confirmed that the trial court's instruction to the jury with CALCRIM No. 315 did not violate the

24

defendant's state or federal constitutional due process rights. In *Lemcke*, our Supreme Court rejected the argument, which is identical to the argument defendant makes here, that CALCRIM No. 315's witness "certainty instruction violated his federal and state due process rights to a fair trial." (*Lemcke, supra,* 11 Cal.5th at p. 646.) Although the *Lemcke* court noted problems with the witness certainty instruction,[9] the court held that the instruction "did not render [the defendant's] trial fundamentally unfair or otherwise amount to a due process violation." (Id. at p. 661.) Even considering *Lemcke*, we conclude defendant was not prejudiced by the trial court instructing the jury with CALCRIM No. 315

### D. CUMULATIVE ERROR

Defendant contended in his opening brief that, considered together, these evidentiary and instructional errors denied him a fair trial. Under the cumulative error doctrine, the cumulative effect of several trial errors may be prejudicial even if they would not be prejudicial when considered individually. (See *People v. Sanchez* (1995) 12 Cal.4th 1, 60, overruled in part on other grounds in *People v. Doolin* (2009) 45 Cal.4th 380, 421.) Here we have found no trial error occurred and any conceivable errors to be harmless, and as a result, collectively they were not prejudicial. (See *People v Lua* (2017) 10 Cal.App.5th 1004, 1019.) Defendant has failed to show cumulative errors warrant reversal.

---

[9] The California Supreme Court referred the matter to the "Judicial Council and its Advisory Committee on Criminal Jury Instructions to evaluate whether or how the instruction might be modified to avoid juror confusion regarding the correlation between certainty and accuracy." (*Lemcke*, *supra*, 11 Cal.5th at p. 647.)

E.    SECTION 12022.53 AND *TIRADO*

In defendant's opening brief, he argued the trial court did not understand at the time of sentencing that it could strike the section 12022.53, subdivision (d), enhancement and impose a lesser enhancement pursuant to section 12022.53, subdivision (b) or (c).  At the time of the appeal there was a split among the Courts of Appeal on the question of a trial court's authority to strike a greater section 12022.53 enhancement and instead impose a lesser, uncharged section 12022.53 enhancement.  In *People v. Morrison* (2019) 34 Cal.App.5th 217, 222-225, the court found that the trial court has discretion to impose a lesser enhancement if it chooses to strike the section 12022.53, subdivision (d), enhancement.  However, this court found in *People v. Yanez* (2020) 44 Cal.App.5th 452, (cause transferred from the California Supreme Court on April 20, 2022, and not citable, S260819); and *People v. Valles* (2020) 49 Cal.App.5th 156, (cause transferred from the California Supreme Court on May 18, 2022, and not citable), S262757, that the trial court only had the discretion to strike or impose the enhancement.  Since this court decided *Yanez* and *Valles*, we found the trial court properly determined that it could only impose or strike the section 12022.53, subdivision (d), enhancement.  The California Supreme Court has resolved the issue in *Tirado*, *supra*, 12 Cal.5th 688.  In supplemental briefing, defendant argued remand is necessary for the trial court to exercise its discretion to impose a lesser enhancement.  Respondent agreed that remand was necessary. Accordingly, we remand for resentencing.

26

## 1. *ADDITIONAL FACTUAL HISTORY*

Sentencing took place on December 5, 2018. Defendant filed a request that the trial court strike the firearm enhancement pursuant to section 12022.53, subdivision (h), which allows for the trial court to strike the enhancement within its discretion, on the basis he was 18 years old at the time of the crime, his immaturity, and lack of an extensive record. He did not ask that a lesser enhancement be imposed. The People contended the trial court should not elect to strike the firearm enhancement pursuant to section 12022.53, subdivision (h), and provided several aggravating factors.

The trial court stated at the sentencing hearing that it had met with the parties in chambers because the case was "troubling and difficult." The trial court was troubled it only had two options for sentencing, which was to impose the firearm enhancement or strike it. The trial court chose not to strike the enhancement noting defendant's easy access to guns, the severity of the crime, and since the victim was shot multiple times.

## 2. *ANALYSIS*

Section 12022.53 provides three different sentence enhancements for the personal use of a firearm in the commission of enumerated offenses: a 10-year enhancement for the personal use of a firearm (§ 12022.53, subd. (b)); a 20-year enhancement for the personal and intentional discharge of a firearm (§ 12022.53, subd. (c)); and a 25-year-to-life enhancement for the personal and intentional discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)). "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this

27

subdivision applies to any resentencing that may occur pursuant to any other law." (§ 12022.53, subd. (h).)

On January 20, 2022, after the Opinion was filed in this case, our Supreme Court issued its opinion in *Tirado*, *supra*, 12 Cal.5th 688. It found that subdivision (j) of section 12022.53 authorizes courts to impose a lesser firearm enhancement after the court has exercised its discretion to strike a greater firearm enhancement under section 12022.53, subdivision (h), provided the facts required to prove the lesser enhancement were alleged and found true by the trier of fact. (*Tirado*, at pp. 699-701.) Section 12022.53, subdivision (j), provides, "For the penalties in this section to apply, the existence of any fact required under subdivision (b), (c), or (d) shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact. When an enhancement specified in this section has been admitted or found to be true, the court shall impose punishment for that enhancement pursuant to this section rather than imposing punishment authorized under any other law, unless another enhancement provides for a greater penalty or a longer term of imprisonment." The *Tirado* court found, "When an accusatory pleading alleges and the jury finds true the facts supporting a section 12022.53(d) enhancement, and the court determines that the section 12022.53(d) enhancement should be struck or dismissed under section 12022.53(h), the court may, under section 12022.53(j), impose an enhancement under section 12022.53(b) or (c)." (*Id.* at p. 700, fn. omitted.)

Here, the facts necessary to support a lesser enhancement under subdivisions (b) and (c) of section 12022.53 were found true by the jury. The jury found both that

28

defendant personally used the firearm and discharged the firearm. (*Tirado*, *supra*, 12 Cal.5th at p. 700.)

As stated in the Opinion, at the time of sentencing the trial court was unaware of its discretion to strike the section 12022.53, subdivision (d), enhancement and impose a lesser included enhancement. Additionally, it was troubled by the fact that it had only two options for sentencing on the firearm enhancement. " '[W]hen the record shows that the trial court proceeded with sentencing on the . . . assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing." (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.) Accordingly, we will order remand of the matter to the trial court for it to conduct another sentencing hearing at which it shall exercise its discretion as to whether to strike the section 12022.53, subdivision (d), enhancement and instead impose a lesser enhancement, as authorized by *Tirado*. The trial court is to apply all newly enacted sentencing laws on remand that are applicable.

F.      OTHER SENTENCING ISSUES

In defendant's opening brief, he also argued that remand to the trial court is necessary for it to conduct an ability to pay hearing for the restitution fine and court operation fees imposed in light of *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). He argued that if this court does not remand under *Dueñas*, this court should order the restitution fine that was imposed by the trial court pursuant to Penal Code section 1202.4, subdivision (b), and the parole revocation fine imposed pursuant to Penal Code section 1202.45 be reduced from $1,000 to $300, the minimum fine. In the

29

Opinion, we directed the trial court to correct the abstract of judgment to reduce the $1,000 restitution fine imposed pursuant to section 1202.4, subdivision (b) to $300; and reduce the parole revocation fine imposed pursuant to section 1202.45 to $300 and stay that amount. In addition, the abstract of judgment was to be corrected to reflect that count 1 is to run consecutive to the sentence on the section 12022.53, subdivision (d), enhancement.

Since we have vacated defendant's sentence and ordered the trial court to conduct a new sentencing hearing taking into account all newly enacted sentencing laws, we need not address these issues.

## DISPOSITION

Defendant's sentence is ordered vacated. The matter is remanded for a full resentencing, with directions to the trial court to consider striking or dismissing defendant's section 12022.53, subdivision (d), firearm enhancement and imposing a lesser firearm enhancement. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.


We concur:

CODRINGTON
J.

FIELDS
J.

30